NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.M.

No. 1 CA-JV 24-0071

FILED 09-26-2024

Appeal from the Superior Court in Maricopa County
No. JS21741
The Honorable Christopher Whitten, Judge

**AFFIRMED**

COUNSEL

Law Office of Ed Johnson PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant*

Kellee McDowell, Phoenix
*Appellee*

**MEMORANDUM DECISION**

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding
Judge Jennifer B. Campbell and Judge Kent E. Cattani joined.

**M c M U R D I E**, Judge:

¶1        Randolph Hatch ("Father") appeals the juvenile court's order terminating his parental rights to Pat, born in 2008.[1] We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Kellee McDowell ("Mother") and Father are Pat's biological parents. Mother and Father never married, ending their relationship a few months after Pat was born.

¶3        The juvenile court granted Mother and Father joint decision-making for Pat but granted Mother the final say on school and medical-related disputes. Father had overnight parenting time with Pat until kindergarten. After that, Father exercised his parenting time less and less, only picking Pat up from school a few times during her fourth-grade year and stopping altogether in middle school.

¶4        In 2020, at the start of COVID-19, Mother did not allow Father to take Pat on a trip to California because Pat "did not feel safe" taking the trip with Father as he would not take precautions. During COVID-19, Father did not have contact with Pat for several months until Father's Day in 2021. Father most recently saw Pat at his mother's funeral in January 2022.

¶5        In November 2022, Mother moved to change Pat's name because Pat wanted to transition from a boy to a girl. Mother contacted Father, informing him of Pat's name-change trial in January 2023. Father opposed Pat's name change and would not refer to Pat by her preferred name or pronouns. After researching the impact of transitioning on adolescents' mental health, Father expressed concern and wanted an opportunity to talk to Pat about transitioning. But Pat did not respond to his text messages.

¶6        After the name-change trial, Mother petitioned the family court to modify the legal decision-making orders. In September 2023, Mother petitioned to terminate Father's parental rights to Pat on the grounds of abandonment, neglect, and chronic substance abuse. Father later petitioned to enforce the family court's visitation and custody orders.

---

[1]        We use a pseudonym to protect the child's identity.

The family court dismissed Mother and Father's petitions because the termination proceedings were ongoing.

¶7          In November 2023, the juvenile court held an initial termination hearing and directed Father to complete a social study before the pretrial conference. A child protective services case manager conducted the social study. According to the study, Pat wanted to have Father's parental rights terminated because she found "his attitude regarding transgender difficult and . . . he bullies her about her life choices." After spending time with Mother and talking with Father, the case manager found that Father did not express an interest in developing a relationship with Pat and instead "only want[ed] [to talk to Pat] to express his disapproval [of her desire to transition]" which would cause her "undue distress and trauma." Based on her observations, the case manager concluded that the termination of Father's parental rights was in Pat's best interests.

¶8          In April 2024, the juvenile court held a termination hearing. Father blamed Mother for his lack of contact with Pat, but the court found Father's testimony lacked credibility. Father conceded that he had not provided Pat with financial support in seven years, had not sent her cards, letters, or gifts, and had only contacted Pat recently through text messages to which she did not respond.

¶9          After the hearing, the juvenile court denied termination under the neglect, abuse, and prolonged substance abuse grounds, finding Mother had not met her burden by clear and convincing evidence. But it granted termination on the abandonment ground. After considering Pat's wishes and the effect of Father's opinions on Pat's mental health, the court found that the termination of Father's parental rights was in Pat's best interests.

¶10          Father timely appealed. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶11          Father argues that "the evidence does not support the termination of [his] parental rights" and termination "is not in [Pat's] best interest" because his refusal to support Pat's life choices around transitioning "is not a reason to terminate the parent-child relationship." He also argues that the juvenile court should not have terminated his parental rights because of the pending family court case.

**¶12** Father's second argument lacks merit. Mother and Father filed petitions in the family court, which the court dismissed because the termination proceedings were ongoing. *See* Ariz. R. Fam. Law P. 5.1(a) (The "juvenile division has jurisdiction over the children" if simultaneous cases are pending.). If the juvenile court had reached a different result, the parties could have reinstituted the family-court filings.

**¶13** Turning to the termination order, we will affirm such an order unless the juvenile court abused its discretion or its factual findings were clearly erroneous. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, [and] judge the credibility of witnesses." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We accept the juvenile court's factual findings unless no reasonable evidence supports them. *Id.* We do not reweigh the evidence on appeal. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

**¶14** The juvenile court granted termination on the abandonment ground. *See* A.R.S. § 8-533(B)(1). Under A.R.S. § 8-531(1),

> "Abandonment" means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

In determining abandonment, the juvenile court considers relevant factors, including whether the "parent has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 36, ¶ 15 (App. 2010) (citation omitted). "What constitutes reasonable support, regular contact, and normal supervision varies from case to case." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 20 (2000) (citation omitted). Abandonment exists if a parent makes only "minimal efforts to support and communicate with the child." *Kenneth B.*, 226 Ariz. at 36, ¶ 14 (quoting A.R.S. § 8-531(1) (2007)).

**¶15** Father does not meaningfully challenge the juvenile court's finding of abandonment, and the record supports that finding. Father has

not had in-person contact with Pat in over two years. *See* A.R.S. § 8-531(A)(1) ("Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment."). Father picked Pat up from school when Pat was younger and had overnight visits with her. But his visits with Pat decreased, and eventually, they stopped as she got older. Father contacted Mother a couple of times during COVID-19 about spending time with Pat. But Mother would not let Father see Pat because he would not take the necessary COVID-19 precautions to make Pat comfortable. Despite Father's complaints that Mother interfered with his parental relationship, he never sought to enforce parenting time before the termination proceedings began. The court found his testimony lacked credibility, and "Father never complained in writing to the Court or anyone else that Mother was unjustly limiting his access to [Pat]." The last time Father saw Pat was at his mother's funeral in January 2022.

**¶16**        Father also conceded he had not financially supported Pat in seven years and had not sent her gifts, letters, or cards. *See Michael J.*, 196 Ariz. at 251, ¶ 24 (Abandonment supported by Father's failure to send gifts, letters, and cards.). Father sometimes texted Pat, but she did not respond. Father tried to contact Pat and expressed a desire to be involved in her decision-making, but these efforts were minimal and did not reflect a normal parental relationship. *See Angel S. v. Dep't of Child Safety*, 237 Ariz. 132, 139, ¶ 23 (App. 2015) (Minimal phone contact, without personal contact, does not maintain a normal parental relationship with a young child.). Thus, reasonable evidence supports the juvenile court's finding of abandonment.

**¶17**        Father suggests the juvenile court improperly terminated his parental rights because he disagreed with Pat's gender identification and life choices around transitioning. As explained below, the court terminated Father's parental rights partly because his opinions affected Pat's mental health and his relationship with her. But the court did not terminate Father's rights based on his opinions alone. The court found that Father's "positions on these issues are not what this case is about." Father failed to develop a parental relationship with his child, support his child emotionally or financially, and then wanted to exercise parental control over her decisions.

**¶18**        After finding at least one statutory ground for termination, the juvenile court must determine whether termination would be in the child's best interests. *Michael J.*, 196 Ariz. at 249, ¶ 12. The petitioner must show either that "(1) the child will benefit from [termination]; or (2) the

child will be harmed if [termination] is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). The court must consider the totality of the circumstances in its best interests determination. *Id.* at 150-51, ¶ 13.

**¶19** Reasonable evidence supports the juvenile court's finding that termination was in Pat's best interests as continuing the relationship with Father "would be detrimental to [Pat] because Father has not shown a respect for [her] choices, her development, or her mental health needs for many years." As stated in the social study, Pat wanted Father's rights terminated "because he bullie[d] her about her life choices." Mother testified that Father had not contacted her over the past few years to ask about Pat's well-being or if she needed anything. He only started showing concern after Mother told him about Pat's name change.

**¶20** The evidence shows that Father's opinions about Pat transitioning affected his ability to develop a normal parental relationship with Pat. But independent of his belief about her transitioning, he failed to support his child in a manner that was conducive to a parental relationship. During the name change trial, with Pat present, Father discussed his opposition to the "LGBTQ community" at length and afterward would not refer to Pat by her preferred pronouns. The case manager found that because of Father's strong opinions, "[h]e did not want to consider or talk about anything that did not [agree] with his opinion." Father's behavior did not suggest that he wanted to develop a relationship with Pat but that he wanted to tell her he disagreed with her choices, which the case manager believed would "cause undue distress and trauma to [Pat]."

**¶21** The case manager concluded that terminating Father's rights would be in Pat's best interests because "father's refusal to even acknowledge [Pat's] feelings . . . is abusive and detrimental to [her] mental health." Thus, the court did not abuse its discretion by terminating Father's parental rights because denying the petition could harm Pat. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 287, ¶ 37 (2005) ("[T]he child's interest in obtaining a loving, stable home, or at the very least avoiding a potentially harmful relationship with a parent, deserves at least as much weight as that accorded the interest to the unfit parent in maintaining parental rights.").

**CONCLUSION**

¶22     We affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AGFV